UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MINTABLE PTE. LTD.,<br><br>        Plaintiff,<br><br>v.<br><br>MINTOLOGY INC. and CINDY JIN, both in her individual capacity and as CEO of Mintology, Inc.,<br><br>        Defendants. | Case No.: 23-cv-08215<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mintable Pte. Ltd., ("Mintable"), by and through its attorneys, for its Complaint against Mintology Inc. and Cindy Jin (collectively, "Defendants"), respectfully alleges as follows:

**NATURE OF THE ACTION**

1. Mintable brings this case against Defendants for trademark infringement pursuant to the Trademark Act of 1946, 15 U.S.C. § 1125 ("Lanham Act"), fraudulent procurement under 15 U.S.C. § 1120, and common law trademark infringement and dilution under New York state law arising from Defendants' unauthorized use of the "Mintology" mark. Mintable seeks declaratory judgment that it is the rightful owner of the "Mintology" mark and injunctive relief.

2. Mintable, a marketplace for non-fungible tokens ("NFTs"), has been at the forefront of innovation in the NFT industry since its founding in 2018. The first platform to pioneer "gasless minting" (the process of creating NFTs without incurring fees to process transactions on blockchains), Mintable has established itself as one of the most comprehensive digital file marketplaces built on the decentralized web. Continuing its ascent, Mintable began development of a new division—Mintology, its enterprise services arm opening the marketplace to corporate

1

clients—in early 2021. Mintable has invested and continues to invest significant resources in the creation and promotion of Mintology, which has since grown to partner with global brands including but not limited to MasterCard, Mediacorp, Station Holdings LLC, Zedge Inc., and Immutable.

3.      In December 2021, Cindy Jin, a U.S.-based entrepreneur, began using the name "Mintology" for an NFT launchpad, Mintology Studio. The business pivoted in or around August 2022—around the same time that defendant Mintology Inc. was incorporated in Delaware—to become an NFT commercial platform, which launched in the fourth quarter of 2022.

4.      In August of 2022, Mintable took action to stop Defendants' infringing use of the "Mintology" name. Mintable's counsel in Singapore sent a cease-and-desist letter to Mintology Studio on August 11, 2022, and, when Ms. Jin did not respond, sent a follow-up letter on August 31, 2022.

5.      Though the letter informed Ms. Jin that the Mintology name was already in use by Mintable in the NFT space and asked her to stop the infringing use, Ms. Jin chose not to heed the request. Rather, on August 26, 2022—approximately two weeks after receiving Mintable's first cease-and-desist letter—Ms. Jin's newly incorporated company, Mintology Inc., filed a trademark application for the "Mintology" name with the United States Patent and Trademark Office ("USPTO").

6.      As of the date of this filing—and following additional cease-and-desist communications addressed to Defendants from Mintable's U.S. counsel—Defendants continue to use the "Mintology" name.

7.      As a result of Defendants' continued and unauthorized use of the confusingly similar "Mintology" name in the same industry, Mintable and its enterprise arm, Mintology, have

2

been harmed.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338 because it arises under United States federal law, the Lanham Act. This Court has supplemental jurisdiction over the related New York state law claims under 28 U.S.C. § 1367 because the claims arise from the same case or controversy.

9. Defendants are subject to the jurisdiction of this Court pursuant to New York Civil Practice Law and Rules ("CPLR") 301 because they are domiciled and/or maintain their principal place of business in New York, and pursuant to CPLR 302 because they transacted business within the state.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

11. Plaintiff Mintable Pte. Ltd. is a Singapore-based company that has been operating an NFT services platform since 2018. In the summer of 2021, following months of development and planning, Mintable launched a new division, Mintology, by Mintable, with its website and social media accounts using the name "mintology.app," to provide NFT services to corporations.

12. Defendant Mintology Inc. is an NFT services platform incorporated in Delaware with its principal place of business at 236 East 15th Street, Apartment 1, New York, New York 10003. Mintology Inc. operates its platform and social media pages with the name "mintology.studio."

13. Defendant Cindy Jin is the founder and CEO of Mintology Studio. Per Ms. Jin's LinkedIn and Twitter/X accounts, she resides in New York, New York and Singapore.

**FACTUAL ALLEGATIONS**

A. **Mintable Launches Mintology and Establishes a Senior Right to the Mintology Name**

14. Owner and CEO Zachary Burks created Mintable as a cheaper and easier alternative to other NFT platforms in December 2018. In December 2020, Mintable developed the concept of "gasless minting," which would allow NFT creators to create NFTs without incurring fees to process transactions on the blockchains that run the underlying Ethereum network. When it rolled out the process in January 2021, Mintable was the first firm to pioneer gasless minting (and was the firm responsible for coining the phrase). The Mintable marketplace—widely available and easily accessed—has been described by Mr. Burks as "the eBay or Amazon for digital items that live on the blockchain."

15. Having eliminated the upfront cost of minting an asset (gas fees), Mintable was positioned to take NFTs, which had not initially gained traction in the market, mainstream. For example, Mintable partnered with CNBC to successfully launch the NFT "Mark Haines Calls the Bottom" in honor of Mark Haines's passing, referring to when Mr. Haines predicted that the S&P 500 had hit its lowest point on March 10, 2009, with all proceeds of the NFT sales going to Autism Speaks and the Council for Economic Education. In recognition of Mintable's potential and the promise of Mr. Burks, one of the most experienced individuals in the Ethereum industry, Mintable caught the eye of high-profile and high-net-worth individuals, who invested in the company.

16. Around February or March 2021, Mr. Burks recognized an opportunity to expand into the business-to-business ("B2B") space and provide businesses with a platform and infrastructure to launch NFT campaigns. In the summer of 2021, after significant planning, development, and effort, he launched a new division, Mintology, that offered a B2B platform that would help large and established brands embrace NFTs as a marketing and promotional tool.

17. Mr. Burks and his team chose the unique moniker "Mintology" for the new B2B division after their research revealed that no other companies in the NFT or technology space used the name.

18. Mintology was promoted as a turnkey solution for businesses to be fully in control of their NFT strategies. It allows businesses and brands to directly integrate NFTs into their websites for a smooth, seamless, and exclusive brand experience, and enables them to launch NFT campaigns for any audience, regardless of their familiarity with cryptocurrency.

19. With an eye toward making the new platform available to the public, Mr. Burks attempted to buy the domain name "mintology.com" in June 2021; however, it was unavailable. On July 9, 2021, Mintable registered the "mintology.app" domain name, which it continues to use to date. The choice of ".app" for the domain name follows Mintable.app, which at the time was the main domain for Mintable.

20. In August 2021, the Mintology team promoted the new platform by sending slide decks to potential clients advertising their plans to make Mintology a first-class platform to purchase and exchange NFTs.

21. These promotional materials were widely circulated, including to numerous U.S. companies, and by the summer and fall of 2021 companies in a range of industries—sports marketing, music, artificial intelligence, gaming, automotive, broadcast, events (ticketing), and embedded tools for creatives and artists—had expressed interest in Mintology. Throughout August and September of 2021, Mintology engaged in conversations with an American watch company regarding that company's collaboration with a video game publisher and possible NFT strategies, and the services that Mintology could provide in connection therewith.

22. Mintology hired its first employee, Jason Sarria-Solia, in September 2021. Brought

on as the general manager of Mintology, Mr. Sarria-Solis had been in the tech and start-up industry for over 20 years, previously creating a successful U.K. telecommunications company and working at a digital bank incorporating cryptocurrency capacity with traditional currencies and credit institutions.

23. September through December 2021 were big months for Mintology, as it expanded its reach internationally and more deeply into the U.S. market. Mintology successfully negotiated a contract with Zedge Inc., a U.S. company that is publicly traded on NASDAQ, and engaged in discussions with MasterCard, a widely known U.S.-based financial services and credit company, as well as Lightricks, an Israeli-company with offices in Chicago, and Geenee.me, a company based out of Los Angeles.

24. Mintology showcased its services at the Singapore Fintech Festival in November 2021 and, on or about January 10, 2022, Mintable applied to register the "Mintology" mark in Singapore.

25. While its trademark application was being processed in Singapore, Mintology continued to make great strides in the United States. Mintology had earned such a positive reputation that the Miami Heat basketball team reached out to it about a series of NFT drops in January 2022. Meanwhile, Messrs. Burks and Sarria-Solis were seeking and working with Mintable's investors, providing them with due diligence information including detailed monthly projections, acquisition costs and valuations, and updates on the brand's success. Reaping the success from its pitch campaign, Mintology negotiated proofs of concepts and contracts with Geeenee.me and MasterCard in the United States, and, capitalizing on the name recognition that Mintology had acquired in the industry, Mintable set up Mintology's Twitter account with the name "mintology.app" and launched the website.

26. On or about March 17-18, 2022, Mintology announced its launch to the general public via publication in digitaljournal.com, a tech-focused news publication, and on the official "mintology.app" Twitter account. This announcement followed an extensive pre-launch phase, during which Mintable and Mintology had, via their offering of gasless minting, already saved companies over $75 million in fees.

27. Mintology continued its public-facing campaign, riding off the support of its pre-public launch work and promotions. Mr. Burks represented the company on a panel at the MasterCard Risk conference in Miami in April 2022 to discuss "Disruptors, Innovators and Securing IOT." Later that month, the Royal Bank of Canada, interested in Mintology, reached out to Mr. Sarria-Solis.

28. In June 2022, Mintology launched what was at the time its largest public-facing campaign to date. Mintology teamed up with Mastercard to launch the "easy as pie" campaign. People could scan a QR code at Mintology's booth in Times Square, on its brochures, or on billboards promoting the campaign around New York City and receive a free NFT which they could redeem for a free slice of pizza at a participating pizza parlor. This city-wide initiative led to over 560 Mintology NFTs being claimed by New Yorkers.

29. On June 17, 2022, Mintology also signed a sponsorship deal with MasterCard to collaborate at NFT.NYC, an industry conference and showcase. The following month, Citibank and Mintable engaged in discussions around a "Citi x Mintology" partnership.

30. As of the date of this filing, Mintable and Mintology continue to be public-facing businesses pairing with major financial institutions and companies. Their customer base consists of over 1 million registered users spread across 50 plus countries, with over 28 million items for sale. They receive millions of page impressions per month.

### B. Defendants Enter the Marketplace

31. As Mintable grew its Mintology division, cultivating brand recognition as a B2B platform for businesses to utilize NFTs, Ms. Jin created a strikingly similar product under the same name: an NFT platform—later an NFT-commerce platform—claiming to be using gasless minting named "mintology.studio."

32. The "mintology.studio" domain and Twitter account were created in August 2021. However, without an operational website, the business was not yet up and running; in fact, a September 2021 press release in Singapore stated that "Mintology Studio" would not launch until the end of September 2021—by which time Mintable's Mintology division was marketing its services and in discussions to expand its footprint with international investors and clients.

33. After "Mintology Studio" missed its projected launch date in September 2021, Ms. Jin announced on her website, mintology.studio, that the product, an NFT launchpad and studio, would launch in the first quarter of 2022. The website was thereafter responsible for various modest NFT drops such as the "Cheeky Corgi" NFT presale for "corgi and pet lovers" in December 2021. Notably, Ms. Jin was the project owner of the "Cheeky Corgi" NFT. No public information shows any business relationships with any sizeable businesses, as opposed to Mintology, which in fact had already established extensive business relationships globally.

34. As Defendant Mintology Inc. would later admit on its USPTO Trademark/Service Mark Application filed on August 26, 2022, attached hereto as Exhibit 1, it first used the "Mintology" name in commerce on December 6, 2021. By contrast, Mintable had been using the "Mintology" mark with prospective brands and investors since the summer of 2021.

35. In or around August 2022, Ms. Jin pivoted her business model. Like Mintable's Mintology division, Ms. Jin's company would be an NFT commerce platform. That product—a

mirror image of Mintable's product—launched in November 2022. As of the date of this filing, Mintology.studio purports to offer its services to brands, touting that they can "instantly reach and connect with NFT native users by creating campaigns using the Mintology platform tools" and "launch their own NFT/exclusive deals to further engage with their target audience."[1] Ms. Jin's company parrots phraseology used by Mintable in its public facing statements, including the phrases "gasless minting" and "claimable NFTs."

36.     On August 8, 2022, Ms. Jin's company incorporated in Delaware as "Mintology Inc." The certificate of incorporation, attached hereto as Exhibit 2, lists a "Lili Jin" as director and provides a New York address for her. On information and belief, "Lili Jin" is defendant Cindy Jin.

### C. **Despite Mintable's Assertion of its Senior Right to the "Mintology" Name, Defendants Continue to Infringe on the Mark and Capitalize on Mintable's Goodwill**

37.     Fearing that Defendants' product—and their infringing use of the "Mintology" name—would confuse Mintable's consumers and investors, and that it would not provide the same high-quality goods or services as the Mintology division, Mintable's counsel in Singapore sent a cease-and-desist letter to Mintology Studio, to the attention of Ms. Jin, on August 11, 2022. The letter is attached hereto as Exhibit 3.

38.     That cease-and-desist letter asserted Mintable's senior claim to the mark, notifying Ms. Jin and her company that Mintable had applied for the "Mintology" trademark in Singapore on January 10, 2022. Citing the confusingly identical names and products offered by Mintable and "mintology.studio," the letter warned Ms. Jin that continued use of the mark would constitute a potential infringement of Mintable's mark. The letter made clear, in no uncertain terms, that Ms. Jin's use of the "Mintology" name was "calculated to deceive and/or mislead the public into

---

[1] *See* https://www.mintology.studio/ (last visited on September 18, 2023).

believing that the Offending Services originate from or are somehow associated with [Mintable]" and that such continued use would damage Mintable's goodwill and reputation because there is a high likelihood of consumer confusion. The letter offered to resolve the issue amicably if Ms. Jin ceased any further use of the mark.

39. Ms. Jin did not respond to the cease-and-desist letter. She did not contact anyone related to Mintable to come to a workable solution. Instead—evincing an intent to capitalize on the goodwill of Mintable's mark, in which Mintable had invested time, money, and resources to develop—she filed a trademark application in the United States for the "Mintology" name (Serial No. 97566272) on August 26, 2022. *See* Exh. 1.

40. Ms. Jin attested in the USPTO trademark application, filed by Mintology Inc., that no other person "ha[d] the right to use the mark in commerce, either in identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive." This statement was patently false; having received the cease-and-desist letter 15 days earlier, Ms. Jin (and by extension, her company, Mintology, Inc.) was indisputably aware that her use of the "Mintology" name infringed on Mintable's trademark.

41. Mintology Inc. affirmed in its USPTO trademark application that willful false statements made in relation to the application are punishable by fine or imprisonment and may jeopardize the validity of the application or submission of any trademark registration.

42. Five days later, on August 31, 2022, Mintable's Singapore counsel sent Mintology Studio, to the attention of Ms. Jin, a follow-up letter, attached hereto as Exhibit 4. The letter noted that, despite having had "ample time to resolve [the] matter amicably," Ms. Jin had failed to acknowledge or respond to the cease-and-desist letter dated August 12, 2022. The follow-up

requested a response within seven days—by September 7, 2022. That date, too, came and went without a response.

43. Fifteen days later, on September 14, 2022, Mintable's Singapore counsel sent a final reminder to Ms. Jin via Twitter and Instagram about the cease-and-desist letter. She did not respond.

44. Several months later, on May 24, 2023, Mintable's U.S. counsel sent Mintology Inc., to the attention of Ms. Jin, another cease-and-desist letter, attached hereto as Exhibit 5. The letter stated that Defendants were knowingly infringing on Mintable's trademark, that their use of the trademark was made with the apparent intent to trade on the goodwill associated with Mintable's mark, and that their attempt to register the mark after receiving explicit notice of Mintable's senior use of the mark evinces bad faith. The letter requested that Defendants immediately cease and desist from all further use of the mark, cancel the registration of the trademark, deactivate all social media accounts, and respond to the letter by June 7, 2023, to ensure an amicable resolution between the parties.

45. Again, neither Mintology Inc. nor Ms. Jin responded to the letter. The Mintology Inc. trademark application remained open and under review.

46. On June 8, 2023, Mintable's U.S. counsel sent a letter to JPG Legal, the law firm that assisted Defendants in filing the U.S. trademark application. The letter to JPG Legal attached the May 24, 2023, cease-and-desist letter and informed counsel of the potential litigation that would ensue if Ms. Jin did not cease and desist from all use of the Mintology name. The June 8, 2023, letter is attached hereto as Exhibit 6.

47. On June 12, 2023, JPG Legal acknowledged receipt of the letter and stated that they had reached out to their client. However, neither Ms. Jin nor her company responded to the letter.

48. On June 13, 2023, Mintology Inc.'s trademark application was assigned to a reviewing attorney at the USPTO. At this point in the process, the federal patent and trademark attorney will review, assess, and rely on the statements made in Mintology Inc.'s application, including the affirmation that Mintology Inc. was unaware of any other company who could claim the valid right to use the name "Mintology"—a statement that was patently false when it was made due to the previous communications and outreach that Mintable made to Defendants.

49. On July 11, 2023, the USPTO requested supplemental information and asked Mintology Inc. to specify its services with "greater precision." This latest development demonstrates that the USPTO is, indeed, reviewing and relying on the statements made in Defendants' trademark application.

D. **Mintable Has Continued to Use the "Mintology" Name in Commerce, Whereas Defendants Have Not**

50. Since sending the cease-and-desist letters, Mintable's Mintology division has continued to expand. Mintology signed a formal license agreement contract with Mastercard, partnered with Las Vegas-based Station Casinos, and continued its international reach with partnership discussions between Mastercard and the Australian Central Bank. In the first few months of 2023, Mintology continued to make strides in building up its consumer base and professional reputation. It signed multiple contracts, some lasting over a year, for fees ranging from $10,000 to $150,000. One client has minted over 1.5 million NFTs on the Mintology platform, and Mintology has signed subsequent contracts with existing clients, demonstrating the strength of the Mintology platform and its customer service.

51. By contrast, the mintology.studio domain name has not been updated since July 24, 2022. The mintology.studio Twitter page, with 2,926 followers, has not been active since March 8, 2023, and the mintology.studio Instagram page, with 109 followers, was last updated on

February 27, 2023, promoting a hotel giveaway.

52. The Mintology division of Mintable continues to grow and establish itself as a corporate and branding servicing platform, as companies migrate toward utilizing NFTs as promotional and marketing tools. However, Mintology's growth will be limited by the actual and potential confusion created by Defendants' continued use of the same mark in the same industry, purporting to offer the same services. Candidates interviewing at Mintology have confused Defendants' website, mintology.studio, for Mintable's Mintology division. In other cases, during interviews with journalists, Mr. Burks has been asked questions about mintology.studio's website in relation to Mintology. Likewise, potential partners and suppliers have mistaken the companies; unaware of Defendants' business, Mintable and Mintology's marketing firm referenced mintology.studio's data and information when providing services to Mintable and Mintology,

## COUNT I
## TRADEMARK INFRINGMEENT UNDER THE LANHAM ACT
### 15 U.S.C. § 1125, *et seq.*
*(As to Defendants Cindy Jin and Mintology Inc.)*

53. Mintable hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

54. Mintable's "Mintology" mark is valid. It is inherently distinctive because it is fanciful, meaning that it has been invented for the sole purpose of functioning as a trademark and the term has no other means other than acting as a mark.

55. Having used the "Mintology" name continuously and systematically in commerce—in connection with the sale and advertising of its Mintology division—beginning in the summer of 2021, Mintable is the senior user of the "Mintology" mark with priority rights to the name.

56. Mintable never permitted Defendants to use the mark "Mintology."

57. Defendants use the "Mintology" mark in the sale and marketing of NFTs, and their services—first an NFT studio and later an NFT commerce platform—are similar, if not identical, to the product offered by Mintable's Mintology division. Moreover, Defendants target the same consumer base as Mintable's Mintology division.

58. Defendants' use of the "Mintology" name in connection with their platform and services comprises an infringement of Mintable's trademark and is likely to cause confusion, mistake, and deception of the public as to the identity and origin of Mintable's services, thereby causing irreparable harm to Mintable for which there is no adequate remedy at law.

59. Defendants' infringement of the trademark constitutes a willful and malicious violation of Mintable's trademark rights, aimed at preventing Mintable from continuing to build a business around and profit from a mark that it has continuously and systematically used and possessed.

60. By reason of the foregoing acts, Defendants are liable to Mintable for trademark infringement under 15 U.S.C. § 1125.

61. As a direct and proximate result of the wrongful conduct of Defendants, Mintable has been damaged and is entitled to the following remedies: a preliminary injunction and permanent injunction against marketing and sale of the offending products under the name "Mintology" or any name incorporating the term "Mintology"; removal of any use of the name "Mintology" on Defendants' website, social media, and related platforms; a stay of Defendants' USPTO trademark application pending the resolution of this litigation; and damages including the disgorgement of profits and attorneys' fees.

## COUNT II
## FALSE OR FRAUDULENT PROCUREMENT
## UNDER THE LANHAM ACT, 15 U.S.C. § 1120
*(As to Defendants Cindy Jin and Mintology Inc.)*

62. Mintable hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

63. In the August, 26, 2022, trademark application filed by Mintology Inc., Mintology Inc. declared under oath that "the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

64. At the time the declaration was made, Defendants in fact possessed actual knowledge, arising out of the multiple cease-and-desist letters sent to Defendants by Mintable's counsel informing Defendants of Mintable's senior right to the "Mintology" name and its ongoing use of the mark.

65. When applying for a trademark, the applicant is required to—and a representative for Mintology Inc. did—sign a sworn statement that:

> The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize that validity of the application or submission or any registration resulting therefrom, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true.

66. The signature of Mintology Inc.'s attorney, on behalf of Mintology Inc., on this application constituted an intentional misrepresentation to the USPTO because Defendants knew that Mintable has senior rights to the "Mintology" mark. Defendants knew that Mintable was the true and lawful owner of the "Mintology" mark.

67. On June 13, 2023, Mintology Inc.'s trademark application was assigned to a reviewing attorney at the USPTO. At this point in the process, the federal patent and trademark attorney will review, assess, and rely on the statements made in Mintology Inc.'s application, including the affirmation that Mintology Inc. was unaware of any other company who could claim the valid right to use the name "Mintology."

68. Defendants' violation of Section 38 of the Lanham Act has caused and, unless restrained, will continue to cause great and irreparable injury to Mintable's goodwill and business in an amount that cannot be presently ascertained, leaving Mintable with no adequate remedy at law. Mintable is therefore entitled to injunctive relief under Section 38 of the Lanham Act, 15 U.S.C. § 1120.

**COUNT III**
**COMMON LAW TRADEMARK INFRINGEMENT UNDER NEW YORK STATE LAW**
*(As to Defendants Cindy Jin and Mintology Inc.)*

69. Mintable hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

70. Mintable's "Mintology" mark is protectable. It is inherently distinctive because it is fanciful, meaning that it has been invented for the sole purpose of functioning as a trademark and the term has no other means other than acting as a mark.

71. Having used the "Mintology" name continuously and systematically in commerce—in connection with the sale and advertising of Mintable's Mintology division—beginning in the summer of 2021, Mintable is the senior user of the "Mintology" mark with priority rights to the name.

72. Mintable never permitted Defendants to use the mark "Mintology."

73. Defendants use the "Mintology" mark in the sale and marketing of NFTs, and their

services—first an NFT studio and later an NFT commerce platform—are similar, if not identical, to the product offered by Mintable's Mintology division. Moreover, Defendants target the same consumer base as Mintable's Mintology division.

74. The acts of Defendants as stated above have and will continue to unjustly enrich Defendants at Mintable's expense by confusing potential investors and prospective customers in the NFT industry.

75. Defendants' actions constitute trademark infringement under the common law of the State of New York.

76. By reason of the foregoing, Mintable has been injured in its business and is entitled to preliminary and permanent injunctive relief and to recover damages.

## COUNT IV
## VIOLATION OF NEW YORK STATE'S ANTI-DILUTION LAW
*(As to Defendants Cindy Jin and Mintology Inc.)*

77. Mintable hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

78. Mintable's "Mintology" mark is inherently distinctive because it is fanciful, meaning that it has been invented for the sole purpose of functioning as a trademark and the term has no other means other than acting as a mark.

79. Defendants' use of the substantially similar (indeed, identical) "Mintology" mark and trade name as alleged above is likely to cause dilution by blurring and/or tarnishing the "Mintology" mark.

80. Defendants' use of the "Mintology" mark and trade name as alleged above will cause Mintable to lose control of the reputation of the "Mintology" name and mark in that consumers and those engaged in the NFT industry, including potential clients interested in

Mintable's Mintology B2B platform, are likely to associate with Mintable the performance of Defendants' products and services, and any detrimental events, legal or regulatory difficulties encountered by Defendants, or any events likely to generate negative publicity that may befall Defendants. Such events, which are outside of Mintable's control, are likely to injure Mintable's business reputation.

81.  Defendants' actions constitute trademark dilution and damage to business reputation in violation of New York General Business Law § 260-l.

## COUNT V
## DECLARATORY JUDGMENT
*(As to Defendants Cindy Jin and Mintology Inc.)*

82.  Mintable hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

83.  Mintable is the first user and owner of the mark "Mintology."

84.  As set forth in the above allegations, Defendants unlawfully use and applied to register the mark "Mintology" for their own exclusive use, which would cause confusion and great and irreparable injury to Mintable.

85.  Unless the rights and obligations of the parties are determined and declared, Mintable will suffer irreparable loss and damage.

86.  Mintable seeks in this action a judicial determination of the parties' rights and obligations as to the ownership and usage of the mark "Mintology" as to guide the parties in their future conduct.

87.  Mintable is entitled to a declaration by this Court of the parties' rights and obligations with regard to the mark "Mintology."

**PRAYER FOR RELIEF**

WHEREFORE, Mintable seeks a judgment against Defendants as follows:

i) That Defendants, their agents, officers, employees, representatives, successors, assigns, attorneys, and all other persons acting for, with, by, through, or under authority from Mintology Studio and/or Mintology Inc., and each of them, be preliminarily and permanently enjoined from:

(1) Using Mintable's "Mintology" mark or any colorable imitation thereof;

(2) Using any trademark that imitates or is confusingly similar to or in any way similar to Mintable's "Mintology" mark, or that is likely to cause confusion, mistake, deception, or public misunderstanding as to the origin of Mintable's products, platform, and services, or its connection to Defendants (with subsection (1), the "Injunction").

ii) That Defendants be required to file with the Court and to serve on Mintable within fifteen (15) days after entry of the Injunction a report in writing under oath that sets forth in detail the manner and form in which Defendants have complied with the Injunction;

iii) That the Court declare that Mintable is the true and rightful owner of the "Mintology" mark and enjoin Defendants from using the mark;

iv) That the Court order Defendants to remove all references, posts, social media pages, online accounts, products, or any other related material or online presence that bears the "Mintology" name.

v) That the Court issue an order canceling Mintology Inc.'s trademark application, Serial No: 97566272, terminating the trademark application.

vi)     That the Court grant Mintable any further relief as it deems just and proper, including but not limited to attorneys' fees.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mintable Pte. Ltd. demands trial by jury in this action of all issues so triable.

DATED: September 18, 2023          Respectfully submitted,

LEWIS BAACH KAUFMANN MIDDLEMISS PLLC

By:   /s/ *Arthur D. Middlemiss*

Arthur D. Middlemiss
(Arthur.middlemiss@lbkmlaw.com)
Elizabeth M. Velez
(Elizabeth.velez@lbkmlaw.com)
Annika B. Conrad
(Annika.conrad@lbkmlaw.com)
The Chrysler Building, 64th Floor
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 826-7001
Facsimile: (212) 826-7146